[relates to Docket Items 9 and 43]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMERSON ELECTRIC CO., et al., | |
| Plaintiffs, | Civil Action No. 05-6042 (JBS) |
| v. | |
| LE CARBONE LORRAINE, S.A., et al., | **OPINION** |
| Defendants. | |

**APPEARANCES:**

Daniel A. Sasse, Esq.
Matthew J. McBurney, Esq.
CROWELL & MORING
3 Park Plaza
Irvine, CA 92614
        - and -
Jerome A. Murphy, Esq.
Kent A. Gardiner, Esq.
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
        - and -
Joel H. Serlin, Esq.
Ronald L. Cornell, Jr., Esq.
SEYBURN, KAHN
2000 Town Center
Suite 1500
Southfield, MI 48075-1195
        Counsel for Plaintiffs

Harris Neal Feldman, Esq.
James Richard Costello, II, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS, LLP
220 Lake Drive East
Suite 200
Cherry Hill, NJ 08002-1165
        - and -
Jonathan S. Feld, Esq.
KATTEN MUCHIN ROSENMANN, LLP
525 W. Monroe Street
Chicago, IL 60661-3693
        Counsel for Defendants Le Carbone Lorraine, Carbone Lorraine North America Corp., Carbone of America Industries Corp. and Emilio Di Bernardo

**Simandle, District Judge:**

## I.   BACKGROUND

This matter is before the Court on Motions to Dismiss the Amended Complaint by Defendants Le Carbone Lorraine, Carbone Lorraine North America Corp., and Carbone of America Industries Corp. [Docket Item 9] and by Emilio Di Bernardo [Docket Item 43]. The Court heard oral argument on April 24, 2007 and reserved decision.

Plaintiffs in this action are companies that opted-out of the larger electrical carbon products anti-trust class action, which settled.  See In re: Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389 (D.N.J. 2006).  Specifically, Plaintiffs are:

1.   Emerson Electric Co., a Missouri corporation with its principal place of business in Missouri;
2.   Valeo, S.A., a French corporation with its principal place of business in Paris, France;
3.   Valeo, Inc., a New York corporation with its principal place of business in Michigan;
4.   Electrolux Home Care Products, Ltd., a Texas limited partnership[1] with its principal place of business in Illinois;
5.   Delphi Corp., a Delaware corporation with its principal place of business in Michigan;
6.   Robert Bosch GmbH, a German corporation with its principal place of business in Stuttgart, Germany;
7.   Robert Bosch Corp., an Illinois corporation with its principal place of business in Illinois;
8.   A.O. Smith Corp., a Delaware corporation with its principal place of business in Wisconsin;
9.   Visteon Corp., a Delaware corporation with its principal place of business in Michigan;
10.  Rockwell Automation, Inc., a Delaware corporation with

---

[1]  The docket sheet incorrectly refers to Electrolux with the "Inc." designation for an incorporated entity.

> its principal place of business in Wisconsin;
> 11.  Baldor Electric Co., a Missouri corporation with its principal place of business in Arkansas;
> 12.  Fasco Industries Inc., a Michigan corporation with its principal place of business in Michigan;
> 13.  Siemens Transportation Systems Inc., a Delaware corporation with its principal place of business in California; and
> 14.  CBS Corp., a Delaware corporation with its principal place of business in New York.[2]

(Am. Compl. ¶¶ 11-24.)

The original Complaint in this action was filed September 23, 2005, in the Eastern District of Michigan.  In December 2005, the case was transferred to this Court by the Judicial Panel on Multidistrict Litigation.  In June 2006, Plaintiffs filed an Amended Complaint in this Court and these motions to dismiss eventually followed.

The defendants moving to dismiss the Amended Complaint are the only remaining defendants who have appeared in this action. Defendant Le Carbone Lorraine ("LCL") is a French company that owns 100% of the shares of Defendant Carbone Lorraine North America.  Carbone Lorraine North America is a New Jersey corporation with its principal place of business in New Jersey. Defendant Carbone of America Industries Corp. is a Michigan corporation with its principal place of business in New Jersey. It is a subsidiary of Carbone Lorraine North America.  The Court

---

[2] Although named as a plaintiff in paragraph 14 of the Amended Complaint, CBS is not listed as a party on the docket. Conversely, Viacom, Inc. is listed as a plaintiff on the docket but is not named as a plaintiff in the Amended Complaint.

shall collectively refer to these companies as "the Carbone Defendants" or "the Carbone group." According to Plaintiffs, Defendant Emilio Di Bernardo was employed by and acted as an agent for the Carbone group and participated in their worldwide conspiracy to fix the prices of electrical carbon products sold in the United States, Europe and elsewhere. (Am. Compl. ¶ 34.)

## II.  ALLEGATIONS OF THE AMENDED COMPLAINT

Plaintiffs allege that between October 1988 and September 2001 Defendants engaged in a conspiracy to fix the prices of electrical carbon products, which Plaintiffs purchased at inflated, non-competitive prices in the United States, Europe and elsewhere. (Am. Compl. ¶ 2). The Amended Complaint defines "electrical carbon products" as:

> carbon brushes, commutators, brush holders,
> and current collectors used in the
> manufacture of direct current electric
> motors, automotive applications and other
> transit applications as well as consumer,
> commercial and industrial products;
> mechanical carbon products used in pump and
> compressor industries; also the blocks of
> carbon from which these products are made.

(Id. at ¶ 10(a)). The Amended Complaint also describes some of those products:

> Carbon brushes are used to transfer
> electrical current in direct current motors
> by acting as the rubbing contacts for
> electrical connectors in motors. Direct
> current motors are used in a variety of
> products including computers, consumer
> products, automobiles, battery-operated
> electric vehicles and public transit

4

> vehicles.  Carbon collectors are used to
> transfer electrical current from wires or
> rails for use in transit vehicles that are
> not independently powered.  Mechanical carbon
> products are sold primarily to pump seal
> manufacturers and are used in fluid handling
> products for containing liquids in wear
> situations.  In this Amended Complaint, the
> types of electrical and mechanical carbon
> products at issue include, but are not
> limited to, carbon current collectors, carbon
> brushes sold to original equipment
> manufacturers for automotive applications,
> traction-transit carbon brushes, industrial
> carbon brushes for use in battery-operated
> vehicles, carbon brushes sold to original
> equipment manufacturers for use in consumer
> products, commercial products and industrial
> applications, and mechanical carbon products
> for use in pump and compressor industries.

(Id.)

Plaintiffs bring this action pursuant to the Sherman Act, 15

U.S.C. § 1; the Clayton Act, 15 U.S.C. §§ 15 and 26; and the

Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.772, et

seq.  (Id. at ¶ 4.)  Plaintiffs seek treble damages, injunctive

relief and attorneys' fees.

Among other things, Plaintiffs allege that:

> Defendants and their Co-conspirators
> conspired in a global price-fixing scheme
> that had the direct and substantial effect of
> keeping prices paid by purchasers in the
> United States artificially high.  Price
> movements in each sales region were
> inextricably linked to all other regions so
> that the prices charged by Defendants and
> their Co-conspirators in other countries
> directly impacted United States prices.
> Defendants and their Co-conspirators fixed
> prices and allocated or controlled customers
> in the United States not merely to capture

5

> cartel profits in the United States, but also
> to allow the cartel to be effective anywhere
> in the world.  Defendants and their Co-
> conspirators knew that their conspiracy would
> not succeed unless they coordinated their
> prices and market shares throughout the
> world.

(Am. Compl. ¶ 72).  Plaintiffs include foreign and domestic companies that bought electrical carbon products in the United States as well as those who purchased abroad.

Plaintiffs also allege more specific domestic conduct that they claim caused foreign injury.  For example, Plaintiffs claim defendants manipulated the prices of raw materials in the United States.  (Id. at ¶ 79).  Those raw materials were converted into products that were sold in Europe with inflated prices.  (Id.) In addition, Plaintiffs allege that the defendants participated in a conspiracy for Morgan Crucible to purchase an American competitor, raise that competitor's prices to the cartel prices, and frustrate international competition and cause domestic as well as foreign antitrust injury by preventing both domestic and foreign Plaintiffs from purchasing at fair prices.  (Id. at ¶ 80).

Plaintiffs also claim that defendants fraudulently concealed their conduct and that the statute of limitations on their claims was tolled until November 4, 2002, when the Department of Justice announced that Morganite (no longer a defendant in this action) had pled guilty to charges of price fixing and obstruction of

justice in connection with the electrical carbon products
industry.  (<u>Id.</u> at ¶¶ 107-11).

## III. MOTION TO DISMISS BY CARBONE DEFENDANTS

### A.  Subject Matter Jurisdiction Over Injuries Arising From Foreign Purchases

Plaintiffs' first cause of action is a claim that Defendants
violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (Am. Compl.
¶¶ 113-17).  By incorporating the allegations of the rest of the
Complaint (<u>id.</u> at ¶ 113), Plaintiffs are seeking damages under
that Act for purchases they made in the United States and in
other countries.  The Carbone Defendants argue that this Court
does not have subject matter jurisdiction under the Sherman Act
to hear Plaintiffs' claims of injury from purchases that occurred
outside the United States.[3]  Plaintiffs oppose, arguing that this
Court has subject matter jurisdiction over all of their antitrust
damages, including those damages arising from foreign purchases.
(Pl.'s Br. Opp. Carbone[4] at 6-21.)

Because it is a challenge to the Court's subject matter
jurisdiction, this motion is appropriately considered a Rule
12(b)(1) motion.  <u>CSR Ltd. v. Cigna Corp.</u>, 405 F. Supp. 2d 526
(D.N.J. 2005).  Further, because this attack on subject matter

---

[3]  Although not a feature of his brief, Defendant Di
Bernardo joins in this argument. (Di Bernardo Br. at 15.)

[4]  Pl.'s Br. Opp. Carbone refers to the brief filed in
opposition to the Carbone Defendants' motion to dismiss.

jurisdiction is a "facial" attack, the Court must take all the facts alleged in the Amended Complaint as true and decide whether the Court has jurisdiction.  See Turicentro, S.A. v. American Airlines, 303 F.3d 293, 300 n.4 (3d Cir. 2004) (explaining difference between facial and factual attacks on subject matter jurisdiction).

Although the parties have submitted additional exhibits, Defendants conceded at oral argument that this is a facial attack and that the Court must accept as true the facts alleged in the Amended Complaint.  Therefore, the Court will look only to the allegations in the Amended Complaint and will not consider these additional exhibits.  Nor will the Court convert these motions to dismiss into motions for summary judgment, as Rule 12(b) permits, because these motions were filed in lieu of Answers, shortly after the Amended Complaint was served and likely before any substantial discovery occurred.  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 893 n.18 (3d Cir. 1977) ("In Doctors, Inc. v. Blue Cross, 490 F.2d 48 (3d Cir. 1973), [a Sherman Act case,] the defendant had filed a 12(b)(1) motion prior to filing an answer, so plaintiffs' jurisdictional allegations were entitled to a presumption of truthfulness." )

The Supreme Court has noted that this Court's jurisdiction is limited:

> Federal courts are courts of limited
> jurisdiction. They possess only that power

8

> authorized by Constitution and statute, <u>see</u>
> <u>Willy v. Coastal Corp.</u>, 503 U.S. 131,
> 136-137(1992); <u>Bender v. Williamsport Area</u>
> <u>School Dist.</u>, 475 U.S. 534, 541 (1986), which
> is not to be expanded by judicial decree,
> <u>American Fire & Casualty Co. v. Finn</u>, 341
> U.S. 6 (1951). It is to be presumed that a
> cause lies outside this limited jurisdiction,
> <u>Turner v. Bank of North-America</u>, 4 U.S. 8
> (1799), and the burden of establishing the
> contrary rests upon the party asserting
> jurisdiction, <u>McNutt v. General Motors</u>
> <u>Acceptance Corp.</u>, 298 U.S. 178, 182-183
> (1936).

<u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377

(1994).

Whether this Court has jurisdiction over the foreign

injuries of Plaintiffs turns on the application of the Foreign

Trade Antitrust Improvements Act ("FTAIA")[5], which says the

Sherman Act:

> shall not apply to conduct involving trade or
> commerce (other than import trade or import
> commerce) with foreign nations unless-
>
> (1) such conduct has a direct,
> substantial, and reasonably foreseeable
> effect--
>         (A) on trade or commerce which is not
> trade or commerce with foreign nations, or on
> import trade or import commerce with foreign
> nations; or
>         (B) on export trade or export commerce
> with foreign nations, of a person engaged in
> such trade or commerce in the United States;

---

[5]   The parties agree that the FTAIA applies because
Plaintiffs allege harm from "conduct involving trade or commerce
. . . with foreign nations," that is, purchases of electrical
carbon products outside the United States.  15 U.S.C. § 6a.

9

and
    (2) such effect gives rise to a claim
under the provisions of this Act, other than
this section.

If this Act applies to such conduct only
because of the operation of paragraph (1)(B),
then this Act shall apply to such conduct
only for injury to export business in the
United States.

15 U.S.C. § 6a.  In other words, the FTAIA

excludes from the Sherman Act's reach much
anticompetitive conduct that causes only
foreign injury.  It does so by setting forth
a general rule stating that the Sherman Act
"shall not apply to conduct involving trade
or commerce . . . with foreign nations." It
then creates exceptions to the general rule,
applicable where (roughly speaking) that
conduct significantly harms imports, domestic
commerce, or American exporters.

F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 158

(2004)(citation omitted) ("hereinafter Empagran").

This technical language initially lays down a
general rule placing all (non-import)
activity involving foreign commerce outside
the Sherman Act's reach. It then brings such
conduct back within the Sherman Act's reach
provided that the conduct both (1)
sufficiently affects American commerce, i.e.,
it has a "direct, substantial, and reasonably
foreseeable effect" on American domestic,
import, or (certain) export commerce, and (2)
has an effect of a kind that antitrust law
considers harmful, i.e., the "effect" must
"giv[e] rise to a [Sherman Act] claim." §§
6a(1), (2).

Id. at 162.

    Moreover, for a court to have jurisdiction over Plaintiffs'

claims involving foreign conduct, not only must the conduct at

issue sufficiently affect American commerce and have effects that give rise to a Sherman Act claim, but those effects must also give rise to <u>Plaintiffs</u>' Sherman Act claim raised in the instant case.  <u>See</u> <u>id.</u> at 174 (reading "a claim" in FTAIA to mean "the 'plaintiff's claim' or 'the claim at issue'").  That is to say, it is not sufficient that a theoretical plaintiff injured in the United States by the conduct at issue might have a Sherman Act claim.  Rather, the foreign anticompetitive conduct must have domestic effects that give rise to Plaintiffs' Sherman Act claim in this case.  If the anticompetitive conduct gives rise to foreign harm to Plaintiffs as well as domestic effects that create a Sherman Act violation unrelated to Plaintiffs, that will not suffice.  <u>See</u> <u>id.</u> at 159 ("the exception does not apply where the plaintiff's claim rests solely on the independent foreign harm.").

In <u>Empagran</u>, the United States Supreme Court held that insofar as foreign purchasers alleged that (1) they are harmed by inflated foreign prices and (2) such harm is independent of any domestic antitrust injury, the Sherman Act does not provide a remedy.  The Court explained that it was "focus[ing] upon anticompetitive price-fixing activity that is in significant part foreign, that causes some domestic antitrust injury, and that independently causes separate foreign injury."  542 U.S. 158.  The Court held that (1) such price-fixing conduct and the foreign

injury that it causes falls within the FTAIA's general rule excluding the Sherman Act's application because it is "'conduct involving trade or commerce . . . with foreign nations'"; and (2) the conduct does not fall within the domestic-injury exception where the plaintiff's claim rests solely on independent foreign harm.  Id. at 159.

However, the Supreme Court remanded to the Circuit Court to decide a more closely-poised issue: whether if the foreign injury were dependent on domestic price-fixing and injury the foreign purchasers would have a Sherman Act claim.

> We have assumed that the anticompetitive conduct here independently caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury.  Respondents argue, in the alternative, that the foreign injury was not independent.  Rather, they say, the anticompetitive conduct's domestic effects were linked to that foreign harm.  Respondents contend that, because vitamins are fungible and readily transportable, without an adverse domestic effect (i.e., higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury. They add that this "but for" condition is sufficient to bring the price-fixing conduct within the scope of the FTAIA's exception.
>
> The Court of Appeals, however, did not address this argument, 315 F.3d at 341, and, for that reason, neither shall we.

Empagran, 542 U.S. at 175.  Defendants argue that this is the

12

factual scenario Plaintiffs allege in this action and the issue
this Court must decide[6] on these motions to dismiss.  Defendants
claim every court faced with this theory, the "arbitrage theory,"
since Empagran has rejected it.  (Carbone Br. at 11-12).  The
Court of Appeals for the Third Circuit has not yet addressed the
arbitrage theory.

However, Plaintiffs claim that they allege more than the
arbitrage theory contemplates.  Plaintiffs claim that the
arbitrage theory was an attempt to circumvent Empagran "by simply

---

[6]  On remand, the D.C. Circuit rejected the viability of
this theory.  Empagran S.A. v. F. Hoffmann-LaRoche, Ltd., 417
F.3d 1267 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1043 (2006).
Holding that there could be no jurisdiction over foreign injuries
unless domestic conduct was the proximate cause of that harm, the
Court found insufficient the allegation of a single global
market.

> The appellants paint a plausible scenario
> under which maintaining super-competitive
> prices in the United States might well have
> been a "but-for" cause of the appellants'
> foreign injury.  As the appellants
> acknowledged at oral argument, however,
> "but-for" causation between the domestic
> effects and the foreign injury claim is
> simply not sufficient to bring
> anti-competitive conduct within the FTAIA
> exception. The statutory language-"gives rise
> to"-indicates a direct causal relationship,
> that is, proximate causation, and is not
> satisfied by the mere but-for "nexus" the
> appellants advanced in their brief.

Id. at 1270-71.  The Third Circuit has not decided the viability
of the global cartel theory or the level of connection a
plaintiff must allege between American effects and foreign
injury.

13

pleading that the success of the cartel in one part of the world
was dependent on fixing prices elsewhere in the world."  (Pl.'s
Br. Opp. Carbone at 12-13).  Plaintiffs argue that they do not
merely allege the "but-for" causation involved in the arbitrage
theory.  (See id. at 14-21).  Rather, Plaintiffs argue, without
citing to the Amended Complaint that:

> Unlike the foreign plaintiffs in Empagran II,
> the Global Plaintiffs [here] are
> multinational corporations, with unitary
> purchasing organizations, that have
> headquarters and/or significant operations
> located in the U.S.  Negotiations for and
> purchases of products (including Electrical
> Carbon Products), are generally made for each
> Global Plaintiff at a global level by a
> single purchasing unit at each company.  This
> structure allows each purchasing unit to shop
> for the best price available worldwide
> (including in the U.S.) and then ship the
> acquired products to all of the Global
> Plaintiff's international locations
> (including the U.S.)
>
> [E]ach member of the cartel adjusted its
> behavior to approach the Global Plaintiffs on
> an international basis with a uniform price.
> Each did this by taking special steps to
> assure that the prices it charged these
> corporations were artificially inflated
> worldwide, frequently using international
> subsidiaries (including those in the U.S.) to
> raise prices.  The result was .... (a) each
> Global Plaintiff essentially paid a single
> price for Electrical Carbon Products across
> all of its global locations, including those
> located in the U.S.; and (b) a cartel
> member's illegal price increases
> *simultaneously* affected the Global
> Plaintiff's facilities in the U.S. and
> abroad.

(Pl.'s Br. Opp. Carbone at 15.)

Those allegations simply do not appear in the Amended
Complaint.  Indeed, Plaintiffs' imprecise language seems to
account for that; for example, Plaintiffs allege, "<u>Essentially,
it is as if</u> each Global Plaintiff negotiated a single contract
for the supply of Electrical Carbon Products to all of its U.S.
and foreign operations from a single supplier (the cartel), at a
single price."  (<u>Id.</u> at 16) (emphasis added); (<u>see</u> <u>also</u> Carbone
Reply at 2)(noting that these allegations were not pleaded).
Plaintiffs come close to describing this kind of arrangement when
they allege that:

> Plaintiffs Emerson, Delphi, Rockwell, Visteon
> and the Bosch and Valeo Plaintiffs
> (collectively, the "Global Plaintiffs") are
> multinational corporations that each
> separately procure Electrical Carbon Products
> worldwide through their own integrated
> purchasing operations.  During the Cartel
> Period, Defendants and their Co-conspirators
> singled out the Global Plaintiffs and other
> similarly situated companies by devising a
> unique global approach to fixing the prices
> of Electrical Carbon Products offered to the
> Global Plaintiffs.  This approach assured
> that worldwide pricing for the Global
> Plaintiffs was centrally managed and
> coordinated.

(Am. Compl. ¶ 76).  However, this is merely a complex description
of the arbitrage theory, which Plaintiffs describe more clearly
in the subsequent paragraph of the Amended Complaint: "if the
cartel did not act to assure that prices in one area of the globe
were no less expensive . . . than those in another area, the
Global Plaintiffs would have been able to purchase their . . .

Electrical Carbon Products in [the less-expensive] area [,thereby] damaging . . . the cartel's stability and profitability." (Am. Compl. ¶ 77). This pleads only the but-for causation that other courts have rejected as a basis for subject matter jurisdiction over claims related to foreign commerce.

In addition, Plaintiffs argue that because they have domestic antitrust claims over which the Court clearly has jurisdiction, they should also be able to bring their foreign claims. (Pl.'s Br. Opp. Carbone at 17-19.) This claim has no merit.

By making arguments about allegations not in the Amended Complaint, Plaintiffs fail to address the Carbone group's claims that the Court lacks subject matter jurisdiction over the foreign injury that *is* alleged in the Amended Complaint. Even if the allegations described in Plaintiffs' brief were in the Amended Complaint, the Court would still lack jurisdiction over them because there is no claim that the foreign purchases directly affected domestic commerce or American import or export commerce, as the statute requires. 15 U.S.C. § 6a. Further, the fact that Plaintiffs may be American companies or have locations in the United States is not relevant to the subject matter jurisdiction inquiry under the FTAIA, Turicentro, 303 F.3d at 301, unless they were claiming injury as American exporters, 15 U.S.C. § 6a(1)(B), which they are not. Therefore, the Court lacks jurisdiction over

16

Plaintiffs' claims related to foreign purchases and shall grant Defendants' motion to dismiss those claims.[7]

**B.   Statute of Limitations and Fraudulent Concealment**

Defendants argue that statutes of limitations preclude Plaintiffs' pre-November 1998 claims, Michigan claim, and claims involving "newly-added products." (Carbone Reply Br. at 9, Carbone Br. at 13-26).  Plaintiffs respond that all relevant statutes of limitations were tolled by (1) Defendants' fraudulent concealment and (2) the related class action from which Plaintiffs opted out.  Because it appears that Plaintiffs have sufficiently alleged fraudulent concealment, and because tolling for fraudulent concealment would make the federal claims timely, the Court shall deny the motion to dismiss the federal claims on statute of limitations grounds, as explained below.

However, because the Michigan tolling provision is more restrictive than the federal one, fraudulent concealment does not save the Michigan claims.  As explained below, the federal class action did not toll the Michigan claims; therefore, the Court shall grant the motion to dismiss those claims.

1.   <u>Federal Claim</u>

Plaintiffs seek to recover treble damages under Section 4 of

_____

[7]   Because the Court is dismissing claims related to purchases abroad, the Court will not decide whether it has personal jurisdiction over Defendant Le Carbone Lorraine; it appears that all claims against Le Carbone Lorraine are dismissed for lack of subject matter jurisdiction under the FTAIA.

the Clayton Act, 15 U.S.C. § 15 (Am. Compl. ¶ 4) for Defendants'
alleged violation of federal antitrust laws.  Because Plaintiffs
allege some harm from conduct over which this Court does have
jurisdiction, notwithstanding the Court's ruling above, it is
appropriate for the Court to consider whether a statute of
limitations bars Plaintiffs' recovery under the Clayton Act for
claims arising prior to November 15, 1998, as the Carbone group
argues. (Carbone Br. at 13).

    The Clayton Act provides, in relevant part:

> any person who shall be injured in his
> business or property by reason of anything
> forbidden in the antitrust laws may sue
> therefor in any district court of the United
> States in the district in which the defendant
> resides or is found or has an agent, without
> respect to the amount in controversy, and
> shall recover threefold the damages by him
> sustained, and the cost of suit, including a
> reasonable attorney's fee.

15 U.S.C. § 15(a).  Under 15 U.S.C. § 15b, such private action
for damages must be brought "within four years after the cause of
action accrued," unless the statute of limitations should be
tolled for some reason,  Zenith Radio Corp. v. Hazeltine
Research, 401 U.S. 321, 338 (1971) ("The basic rule is that
damages are recoverable under the federal antitrust acts only if
suit therefor is 'commenced within four years after the cause of
action accrued,' 15 U. S. C. § 15b, plus any additional number of
years during which the statute of limitations was tolled.").

    As this Court explained when denying a similar motion to

dismiss in the larger electrical carbon products class action, In re: Elec. Carbon Prods. Antitrust Litig., 333 F. Supp. 2d 303, 315 (D.N.J. 2004), "The tolling of the statute of limitations due to 'fraudulent concealment' is an 'equitable doctrine [that] is read into every federal statute of limitations.'" (quoting Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946)) (alteration in In re: Elec. Carbon Prods.).  If a plaintiff can establish that a defendant fraudulently concealed its actions such that the plaintiff could not know of its injury during the limitations period, the Court shall toll the statute of limitations during that term of concealment.  In re: Elec. Carbon Prods., 333 F. Supp. 2d at 315.  "Where fraudulent concealment of a federal anti-trust claim has been shown by a plaintiff, the four-year federal statute of limitations begins anew from the time the plaintiff knew or should have known of the existence of the federal claim."  State of Mich. ex rel. Kelley v. McDonald Dairy Co., 905 F.Supp. 447, 451 (W.D. Mich. 1995) (citing Norton-Children's Hosp. v. James E. Smith & Sons, Inc., 658 F.2d 440, 445 (6th Cir.1981)).

> To establish this tolling, the plaintiff must show:
>
> 1. an affirmative act of concealment by each defendant,
>
> 2. that the defendant's actions misled the plaintiff or relaxed its inquiry, and

3. that the plaintiff exercised due diligence
during the statutory period.

In re Lower Lake Erie Iron Ore Antitrust
Litig., 998 F.2d 1144, 1178-79 (3d Cir.
1993).  On a motion to dismiss, the relevant
inquiries are two-fold; first, the Court must
determine whether, accepting the allegations
in the Complaint as true, the plaintiffs have
stated a claim for fraudulent concealment,
see Scheuer v. Rhodes, 416 U.S. 232, 236
(1974), and second, the Court must determine
whether the plaintiffs have alleged
underlying acts of fraudulent concealment
with particularity as required by the
heightened pleading standard for fraud claims
provided by Rule 9(b), Fed. R. Civ. P., see
Byrnes v. DeBolt Transfer, Inc., 741 F.2d
620, 626 (3d Cir. 1984).

In re Elec. Carbon Prods. Antitrust Litig., 333 F. Supp. 2d at

315.  However, "[w]hen a Clayton Act conspiracy is involved, the

plaintiff must allege 'active concealment' by [only] one

defendant in the conspiracy, as such an act can, if the

conspiracy is established, be attributed to the other members of

the conspiracy."  Id. at 315-16 (citing Davis v. Grusemeyer, 996

F.2d 617, 624 (3d Cir. 1993)).

The allegations that the Court found sufficient to state a

claim for fraudulent concealment in the class action complaint

are extremely similar to the allegations in the Amended Complaint

here.  The class plaintiffs alleged injury beginning in 1990

while Plaintiffs in this action allege injury beginning in 1988.

In both cases, however, the date of injury was "determined, in

part, by the European Commission's finding that the 'secret

20

cartel' existed. . . . between October 1988 and December 1999."
<u>In re Elec. Carbon Prods. Antitrust Litig.</u>, 333 F. Supp. 2d at
316.  As in the related case, the plaintiffs in this case "have
alleged that there were no 'suspicious circumstances' or 'storm
warnings' that would have alerted them to the possibility of
fraud until the November 4, 2002 guilty pleas of Morganite and
Morgan Crucible, meaning that their responsibility to investigate
the fraud was not triggered until that date."  <u>Id.</u> at 317; (<u>see</u>
Am. Compl. ¶ 107).  Plaintiffs here allege additional acts of
concealment.  Citing the European Commission report, Plaintiffs
note that Defendants and their co-conspirators concealed their
conspiracy by using code names, sending correspondence to post
boxes, staggering price changes to create the appearance that
they made decisions independently and camouflaging price
increases as charges for services performed.  (<u>Compare</u> Am. Compl.
¶ 109 <u>with</u> Third Am. Compl. in 03-2182 ¶¶ 72, 75).

However, the Carbone Defendants were not participants in the
motion to dismiss in the prior case.  Therefore, they are not
bound by that decision.  Further, the Carbone defendants allege
that as of 2000, at the latest, there were "storm warnings"
indicating that Plaintiffs should investigate whether they might
have claims against the Carbone defendants.  First, the Carbone
Defendants allege that in their 1999 annual report they disclosed
the Justice Department's investigation into a separate market,

21

the American graphite products industry.  Second, the Carbone
Defendants allege that in 2000 Defendants Carbone of America
Industries and Michel Coniglio[8] entered guilty pleas, but do not
indicate that those pleas were related to the electrical carbon
products industry.  Third, the Carbone Defendants allege that,
also in 2000, the United States Justice Department issued a press
release regarding the cooperation of Carbone of America
Industries Corp. and Coniglio.  However, as explained above, on
this motion to dismiss the Court cannot credit these assertions,
made in Carbone's briefs, over the allegations in the Amended
Complaint.  Moreover, the "storm warnings" of a separate
conspiracy should not have triggered a heightened obligation on
Plaintiffs' part to investigate whether a similar conspiracy

---

[8]  According to Plaintiffs, Defendant Michel Coniglio, who
has not appeared in this matter:

> simultaneously held executive-level positions
> in Defendants LCL and Carbone of America
> during the Relevant Period.  On behalf of
> Defendant LCL, Mr. Coniglio served as Vice-
> President of the Advanced Materials and
> Technologies Division, Vice-President of
> North America and South America and as a
> member of the Company's Executive Committee.
> At the same time, Mr. Coniglio served as
> President and Chief Executive Officer of
> Carbone of America.  During the Relevant
> Period, Mr. Coniglio was employed by and
> acted as an agent for LCL and Carbone of
> America, during which time Mr. Coniglio
> participated in the worldwide conspiracy to
> fix prices of Electrical Carbon Products sold
> in the United States.

(Am. Compl. ¶ 30).

existed in the electrical carbon products industry.

If the statute of limitations is tolled until November 2002, when Plaintiffs allege they learned of the conspiracy, then claims brought within four years of that date would be timely. The Amended Complaint was filed in June 2006 and would, therefore, be timely.[9]

As in the multidistrict litigation, Plaintiffs have sufficiently pled fraudulent concealment to survive this motion to dismiss.[10]  As the Court explained in that class case,

> Plaintiffs will have to prove these allegations in order to toll the statute of limitations, but for purposes of this motion, accepting them as true, the plaintiffs have properly alleged due diligence and have provided a specific factual basis for their allegation. Whether evidence of "suspicious circumstances" or "storm warnings" emerge during the course of discovery in this case remains to be seen.
>
> Therefore, this Court will deny the defendants' motion to the extent that they seek more particular pleading of the fraudulent concealment claims.

---

[9]   In addition, Plaintiffs argue that the filing of the class action complaint tolled this action.  Although this appears to be true, it also appears irrelevant because the claims were filed within four years of November 2002 and the Plaintiffs have stated a claim for fraudulent concealment until that date, as discussed below.  Therefore, the Court need not address whether Plaintiffs assert claims as to new products that were not asserted in and not tolled by the class action.

[10]   Because Plaintiffs have adequately pled that Defendant Di Bernardo was a member of the conspiracy, the Court will also toll the statute of limitations on claims against him for fraudulent concealment until November 2002.  See Davis v. Grusemeyer, 996 F.2d 617, 624 (3d Cir. 1993).

23

Id. at 317-18.  Thus, the parties are free to argue the issue
again with a more fully developed record on a motion for summary
judgment.

     2.  <u>Michigan Claim</u>

    Plaintiffs' second cause of action is a claim that
Defendants violated §§ 445.772 and 445.778 of the Michigan
Antitrust Reform Act.  (Am. Compl. ¶ 119).  Section 445.772
provides: "A contract, combination, or conspiracy between 2 or
more persons in restraint of, or to monopolize, trade or commerce
in a relevant market is unlawful."  Mich. Comp. Laws § 445.772.
Section 445.778 provides, in relevant part:

> Any [private] person threatened with injury
> or injured directly or indirectly in his or
> her business or property by a violation of
> this act may bring an action for appropriate
> injunctive or other equitable relief against
> immediate irreparable harm, actual damages
> sustained by reason of a violation of this
> act, and, as determined by the court,
> interest on the damages from the date of the
> complaint, taxable costs, and reasonable
> attorney's fees. If the trier of fact finds
> that the violation is flagrant, it may
> increase recovery to an amount not in excess
> of 3 times the actual damages sustained by
> reason of a violation of this act.

Mich. Comp. Laws § 445.778(2).  As under federal law, actions for
damages under this provision have a four-year statute of
limitations.  Mich. Comp. Laws § 445.781(2).

    Michigan law also extends the period of limitations when
defendants fraudulently conceal their conduct; however, unlike

federal law, Michigan law does not truly toll the statute of limitations, but rather requires suit within two years of discovery of the concealed claim:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Mich. Comp. Laws § 600.5855.

Nevertheless, Plaintiffs argue that their delay in asserting state law claims is further excused by the federal class action which, they argue, tolled the Michigan claims.  The Carbone group argues that "[s]tate law claims are not tolled under Michigan law for class members who have opted out of an earlier [federal] class action."  (Carbone Br. at 23) (citing Warren Consol. Schs. v. W.R. Grace & Co., 518 N.W. 2d 508 (Mich. Ct. App. 1994), appeal denied, 530 N.W.2d 750 (1995)).  In addition, the Carbone Defendants argue that the state law claims related to "indirect" purchases should not be tolled because those claims are not viable under federal law and therefore could not have been asserted in the related class action.  Plaintiffs concede this claim is only viable under Michigan law.

Plaintiffs rely on a Michigan Supreme Court case, Cowles v.

25

<u>Bank West</u>, 719 N.W.2d 94 (Mich. 2006), which applied Michigan's tolling rule for class claims to a factually-related federal claim.  That tolling rule provides,

> (1) The statute of limitations is tolled as to all persons within the class described in the complaint on the commencement of an action asserting a class action.
> (2) The statute of limitations resumes running against class members other than representative parties and intervenors:
>    (a)  on the filing of a notice of the plaintiff's failure to move for class certification under subrule (B)(2);
>    (b)  28 days after notice has been made under subrule (C)(1) of the entry, amendment, or revocation of an order of certification eliminating the person from the class;
>    (c)  on entry of an order denying certification of the action as a class action;
>    (d)  on submission of an election to be excluded;
>    (e)  on final disposition of the action.

Mich. Ct. R. 3.501 (F).  The issue before the Court in <u>Cowles</u> was "whether the filing of a class-action complaint tolls the period of limitations under MCR 3.501(F) for a putative class member's claim when that claim was not pleaded in the initial class-action complaint but arose out of the same factual and legal nexus." 719 N.W.2d at 96.  The court held that "the filing of such a complaint is sufficient to toll the period of limitations as long as the defendant has notice of both the claim being brought and the number and generic identities of the potential plaintiffs." <u>Id.</u> at 96-97.

Plaintiffs argue that although Michigan's highest court has not ruled on whether to permit tolling of state law (non-class) claims while a motion for class certification was pending in a factually-related class action asserting only federal claims, that the Michigan court would likely do so, as <u>Cowles</u> indicates a desire to ensure the efficiency of the class action device.[11] Plaintiffs also argue that the Court should adopt federal equitable tolling provisions because to do otherwise would frustrate the purposes of Rule 23, in contravention of the Supremacy Clause.

Because this Court finds that the federal class action would not toll the statute of limitations for unplead Michigan claims under federal or Michigan tolling law, the Court need not reach the Supremacy Clause issue.  However, the Court shall grant the motion to dismiss the Michigan claims as barred by the statute of limitations.

"Under the Supreme Court's decision in <u>American Pipe & Construction Co. v. Utah</u>, 414 U.S. 538 (1974), the filing of a class action complaint tolls the statute of limitations for all members of the putative class who, following the denial of certification, intervene or file an independent action." <u>McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.</u>, 295 F.3d 380, 382 (3d Cir.

---

[11]   When adjudicating a case under state law, this Court must "predict how the highest court of that state would decide the relevant legal issues." <u>Kowalsky v. Long Beach Twp.</u>, 72 F.3d 385, 388 (3d Cir. 1995).

2002).[12]  However, in this case, Plaintiffs allege that the
filing of a class action complaint tolls a <u>separate</u> statute of
limitations on separate but factually-related claims that were
not brought in the class action on anyone's behalf.

   The Supreme Court has explained that strong policy reasons
support the federal rule tolling individual federal claims when a
prior class action was filed asserting identical federal claims.

> [A] tolling rule for class actions is not
> inconsistent with the purposes served by
> statutes of limitations. Limitations periods
> are intended to put defendants on notice of
> adverse claims and to prevent plaintiffs from
> sleeping on their rights, but these ends are
> met when a class action is commenced. Class
> members who do not file suit while the class
> action is pending cannot be accused of
> sleeping on their rights; Rule 23 both
> permits and encourages class members to rely
> on the named plaintiffs to press their
> claims. And a class complaint "notifies the
> defendants not only of the substantive claims
> being brought against them, but also of the
> number and generic identities of the
> potential plaintiffs who may participate in
> the judgment." <u>American Pipe</u>, 414 U.S., at
> 555. The defendant will be aware of the need
> to preserve evidence and witnesses respecting
> the claims of all the members of the class.
> Tolling the statute of limitations thus
> creates no potential for unfair surprise,
> regardless of the method class members choose

---

   [12]  The Third Circuit does not appear to have decided
whether that same tolling should apply to Plaintiffs who opt out
of class actions that are certified.  The reasoning of <u>American
Pipe</u>, that tolling promotes the efficacy of Rule 23 by preventing
individual actions, would not apply if the Court permitted
tolling for those class members who opted out of class actions
where class certification is ultimately granted.  On the other
hand, the ability to opt out is an important aspect of Rule
23(b)(3), which courts should also be reluctant to undermine.

> to enforce their rights upon denial of class
> certification.

Crown v. Parker, 462 U.S. 345, 352-53 (1983) (citations omitted).

Those same policy considerations do not support tolling claims brought under separate statutes.  Plaintiffs can be said to have slept on their Michigan rights and the federal action did not notify the defendants of the substantive claims against them in this action.  For example, the parties concede that Michigan law permits recovery for indirect purchases – alleged by Plaintiffs Valeo SA and Valeo, Inc. – but federal law does not.  Therefore, the defendants might not have been aware of their need to preserve evidence of such claims prior to Plaintiffs' decision to opt out of the class action.

Further, while under federal law "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action'" and "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied," Crown, 462 U.S. at 353-54, Plaintiffs asserting new claims under a different statute should not benefit from this tolling because they would not have been able to continue as parties in the original class action.  See Warren Sch., 518 N.W.2d at 511 (declining tolling under Michigan law because plaintiff would not have been able to continue as a party

29

in original class action).  Their claims were not encompassed
within the claims asserted by those class members.

Although the Michigan Supreme Court has not ruled directly
on this issue, Michigan jurisprudence does not differ greatly on
tolling issues.  An appellate court in Michigan has said that a
class action in federal court, from which a plaintiff opts out,
does not toll the statute of limitations on that plaintiff's
claims in Michigan state court.  Warren Sch., 518 N.W.2d at 511
("there is no public policy reason to allow a plaintiff to enjoy
the tolling benefit of a class action in which it chose not to
join, and to file an otherwise stale cause of action.").  Under
federal and Michigan law, the burden is on a litigant seeking to
invoke equitable tolling to prove entitlement to that tolling.
Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); McLaughlin v.
Aetna L. Ins. Co., 221 Mich. 479, 483 (Mich. 1922).  Plaintiffs
have not met this burden.

Plaintiffs argue, however, that a separate court rule
directs this Court to toll their claims.  Under Michigan Court
Rule 3.501 (F)(2)(d), the statute of limitations is tolled on
"related" claims until Plaintiffs file a notice to opt out.
Plaintiffs initially sought to opt out from the multidistrict
litigation on August 19, 2005.  If the Court believes that the
Michigan Courts would permit tolling of state claims for
factually related but legally distinct federal class claims, then

30

Plaintiff's claims in this case, filed one month later, would be timely.  However, the Michigan Supreme Court explained this rule in the Cowles case and (1) required that the claim arise out of "the same factual and legal nexus," 719 N.W.2d at 96 (emphasis added) and (2) included a caveat: there could be no tolling unless the prior class action gave defendants "notice of both the claim being brought and the number and generic identities of the potential plaintiffs," id. at 96-97.  Because indirect purchases could not have been asserted as a basis for liability in the prior case, those claims did not arise out of the same legal nexus.  Nor did the prior class action give Defendants notice of that claim and the Plaintiffs who might assert it.  Further, Plaintiffs cannot claim to have relied upon the existence of the MDL class action to preserve their previously unplead state law claims, since Plaintiffs filed their Michigan case while the MDL case was still pending.

The original Complaint in this action was filed September 23, 2005, in the Eastern District of Michigan.  Plaintiffs have pled fraudulent concealment through November 4, 2002.  Because the Court will not add tolling time on the unpled state claims due to  the pendency of the federal class action, Plaintiffs were required to bring their Michigan state law claims by November 4,

2004.  Mich. Comp. Laws § 600.5855.[13]  They failed to do so;
therefore, the Court shall grant the motion to dismiss the
Michigan claims on statute of limitations grounds.

IV.  **MOTION TO DISMISS BY EMILIO DI BERNARDO**

   A.  **Statute of Limitations**

   Plaintiffs first asserted claims against Defendant Di
Bernardo on June 14, 2006, when they amended the Complaint.  As
discussed above, there is a four-year statute of limitations for
federal and Michigan antitrust claims.  However, because
Plaintiffs have adequately alleged that Di Bernardo was a member
of the conspiracy to fix prices on electrical carbon products and
because Plaintiffs have adequately pled fraudulent concealment up
until November 4, 2002, the claims are tolled until that date.
See n.10, supra.  Therefore, Plaintiffs' federal claims were
timely against Defendant Di Bernardo.

   However, Plaintiffs' Michigan claims would not be timely
unless the Court finds that an additional period of time between
2002 and 2006 should be tolled, as Michigan law requires claims
to be asserted within two years of discovery.  Mich. Comp. Laws §
600.5855.

   Plaintiffs allege in their briefing on this motion that they

---

[13]  Alternatively, Plaintiffs could assert Michigan
antitrust claims for conduct arising after September 23, 2001,
under the ordinary four-year statute of limitations.  However,
the Amended Complaint indicates that the antitrust conspiracy
terminated sometime in September 2001.

did not learn of Mr. Di Bernardo's involvement in the conspiracy until December 21, 2005 and that the claims against him should be tolled until that date, making the claims timely under Michigan law.

Michigan law requires bringing an antitrust claim within two years "after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim." Mich. Comp. Laws § 600.5855.  Had Plaintiffs asserted in the Amended Complaint that they did not discover Di Bernardo's involvement until 2005, the issue, then, would be whether Plaintiffs should have discovered Di Bernardo's involvement in the conspiracy sooner.  Plaintiffs do not address this issue and it is not clear whether they concede that they failed to comply with this discovery rule.  Instead, Plaintiffs cite Michigan v. McDonald Dairy Co., 905 F. Supp. 447, 451-52 (W.D. Mich. 1995) for the proposition that federal precedents on tolling should be applied to the state tolling rule.  (Pl.'s Br. Opp. to Di Bernardo at 6).  However, that case actually explained the distinction between federal and Michigan tolling for fraudulent concealment.  The "federal precedent" adopted into Michigan law in that case was the rule that co-conspirators' acts of concealment are attributed to one another.  Plaintiffs' citation of McDonald Dairy leaves the impression that Michigan permits

33

four years after the date of discovery to file an anti-trust
action – it does not.

In any event, the Amended Complaint does not allege
fraudulent concealment by Di Bernardo or any other conspirator up
until 2005, the date Plaintiffs argue was the date of actual
discovery.  The Court cannot attribute concealment to Di Bernardo
up until that date when none is alleged against a coconspirator,
or him.  Furthermore, even if Di Bernardo concealed his
involvement until December 2005, Plaintiffs inexplicably waited
until June 2006 to amend their complaint to add him.  This six-
month delay is not attributed to any alleged fraud on the part of
any conspirator.

As discussed, Plaintiffs' Michigan claims were not tolled
while the class action was pending because the Michigan claims
are fundamentally different from the federal claims.  More
importantly for the claims against Mr. Di Bernardo, he was not a
Defendant in the prior action.  See Jama v. U.S. Imm. & Nat.
Serv., 343 F. Supp. 2d 338, 364 (D.N.J. 2004) (tolling only as to
defendant named in prior complaint); see also McKowan Lowe & Co.
v. Jasmine, Ltd., 295 F.3d 380, 384-85 (3d Cir. 2002) ("[T]he
Court in American Pipe held that the tolling rule is consistent
with the twin functions of statutes of limitations--providing
defendants with timely notice and avoiding stale claims--because
the action is tolled only by timely service of the class

34

complaint on the defendants by the named plaintiffs.").
Additionally, under Fed. R. Civ. P. 15(c)(3), the claims against
him do not relate back to the date of the original complaint in
this action, which did not name him as a party, because he
received no notice of claims against him within 120 days of that
complaint.

Plaintiffs failed to bring this action against Di Bernardo
by November 4, 2004, as Michigan law required.  Therefore, the
Court shall grant Di Bernardo's motion to dismiss Plaintiffs'
Michigan claims against him.

## B.   Personal Jurisdiction

Di Bernardo moves to dismiss the federal antitrust claims
against him for lack of personal jurisdiction.[14]  Although
Plaintiffs bear a burden of establishing jurisdiction, the Court
must accept their allegations as true:

> To survive a motion to dismiss for lack of
> personal jurisdiction, a plaintiff bears the
> burden of establishing the court's
> jurisdiction over the moving defendants.
> However, when the court does not hold an
> evidentiary hearing on the motion to dismiss,
> the plaintiff need only establish a prima
> facie case of personal jurisdiction and the
> plaintiff is entitled to have its allegations
> taken as true and all factual disputes drawn
> in its favor.

---

[14]  He also moved to dismiss the Michigan claims on personal
jurisdiction grounds, but because the statute of limitations has
run on those claims, the Court need not address personal
jurisdiction as to the Michigan claims.

Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)
(citation omitted).  When a defendant raises a jurisdictional
defense, the plaintiff must then show, "that the cause of action
arose from the defendant's forum-related activities (specific
jurisdiction) or that the defendant has 'continuous and
systematic' contacts with the forum state (general
jurisdiction)."  Mellon Bank (EAST) PSFS, N.A. v. DiVeronica
Bros., Inc., 983 F.2d 551, 554 (3d Cir. 1993).

The Court will not find specific jurisdiction unless Di
Bernardo has purposefully availed himself of the forum:

> Specific jurisdiction exists only where the
> defendant has sufficient minimum contacts
> with the forum state that it "should
> reasonably anticipate being haled into court
> there." World-Wide Volkswagen Corp. v.
> Woodson, 444 U.S. 286, 297 (1980).  The
> "'constitutional touchstone'" is whether the
> defendant purposefully established those
> minimum contacts. North Penn Gas Co. v.
> Corning Natural Gas Corp., 897 F.2d 687, 690
> (3d Cir.) (quoting Burger King Corp. v.
> Rudzewicz, 471 U.S. 462, 474 (1985)), cert.
> denied, 111 S. Ct. 133 (1990). A court must
> find that there was some act by which the
> defendant "purposefully availed itself" of
> the privilege of conducting activities within
> the forum. Hanson v. Denckla, 357 U.S. 235,
> 253 (1958).

Mellon Bank, 983 F.2d at 554.  Further, the Court may exercise
specific jurisdiction only if the claim in the case at bar arises
out of those minimum contacts.  Helicopteros Nacionales de
Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984); IMO Indus.,
Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998).  But

"[p]hysical presence within the forum is not required to
establish personal jurisdiction over a nonresident defendant."
Id.

Di Bernardo argues that the rule permitting a court to
aggregate a foreign company's national contacts when determining
whether the court has personal jurisdiction over that company
does not apply to foreign individuals sued for antitrust
violations in the United States.  Plaintiffs do not dispute this
and it appears to be correct.

When the Court of Appeals for the Third Circuit adopted the
national contacts test for personal jurisdiction in federal
antitrust actions, it explained that the federal statute
permitting nationwide or worldwide service of process was key to
its decision.  In re Auto. Refinishing Paint Antitrust Litig.,
358 F.3d at 298 (quoting Pinker v. Roche Holdings Ltd., 292 F.3d
361, 369-70 (3d Cir. 2002)).  In Pinker, a securities case, the
Third Circuit explained the importance of the statutory service
provision to its personal jurisdiction holding:

> Where Congress has spoken by authorizing
> nationwide service of process, therefore, as
> it has in the Securities Act, the
> jurisdiction of a federal court need not be
> confined by the defendant's contacts with the
> state in which the federal court sits. See
> DeJames v. Magnificence Carriers, Inc., 654
> F.2d 280, 284 (3d Cir. 1981). Following this
> reasoning, the district courts within this
> Circuit have repeatedly held that a "national
> contacts analysis" is appropriate "when
> appraising personal jurisdiction in a case

37

> arising under a federal statute that contains
> a nationwide service of process provision."
> <u>AlliedSignal, Inc. v. Blue Cross of Calif.</u>,
> 924 F. Supp. 34, 36 (D.N.J. 1996); <u>see</u> <u>also</u>
> <u>Green v. William Mason & Co.</u>, 996 F. Supp.
> 394, 396 (D.N.J. 1998) ("An assessment of
> personal jurisdiction under [a statutory
> provision authorizing nationwide service of
> process] necessitates an inquiry into the
> defendant's contacts with the national
> forum."). We too are persuaded by the
> reasoning of our prior opinions on the
> subject, and, consistent with several of our
> sister courts of appeals, hold that a federal
> court's personal jurisdiction may be assessed
> on the basis of the defendant's national
> contacts when the plaintiff's claim rests on
> a federal statute authorizing nationwide
> service of process.

292 F.3d at 369.  Thus, it is important to note that 15 U.S.C. §

22 authorizes nationwide service of process against any

corporation.  The statute provides:

> Any suit, action, or proceeding under the
> antitrust laws against a corporation may be
> brought not only in the judicial district
> whereof it is an inhabitant, but also in any
> district wherein it may be found or transacts
> business; and all process in such cases may
> be served in the district of which it is an
> inhabitant, or wherever it may be found.

"It is undisputed that the second clause authorizes nationwide,

indeed worldwide, service of process on a defendant corporation

in federal antitrust litigation."  <u>In re Auto. Refinishing Paint</u>

<u>Antitrust Litig.</u>, 358 F.3d 288 at 293.  There is no such

provision for worldwide or nationwide service on individuals.

Thus, the Court will not aggregate Di Bernardo's nationwide

contacts to determine whether it has personal jurisdiction over

38

him for the claims asserted in this action.

Rather, the Court will look to the contacts with Michigan, the forum state from which this action was transferred, to determine whether due process permits the assertion of personal jurisdiction over Di Bernardo.  See id. at 297 n.11 (explaining that for MDL cases courts conducting personal contacts analysis must look to contacts with forum where case was filed).  Because Plaintiffs have not alleged sufficient contact between Di Bernardo and Michigan to meet the requirements of specific or general jurisdiction, the Court does not have personal jurisdiction over him.

Plaintiffs rely on the fact that several of them have headquarters in Michigan and that, therefore, the effects of Mr. Di Bernardo's conspiracy were felt in Michigan.  (Pl.'s Br. Opp. Di Bernardo at 11-12).  This allegation, even if properly asserted in the Amended Complaint, is entirely insufficient to satisfy the guarantees of due process.  Plaintiffs have alleged no purposeful availment of Michigan by Di Bernardo such that he could reasonably anticipate being haled into court there.  Therefore, the Court shall grant his motion to dismiss for lack of personal jurisdiction.

## V.   CONCLUSION

For the foregoing reasons, the Court shall grant the motion to dismiss claims arising out of foreign purchases of electrical

39

carbon products; claims arising under Michigan law; and claims against Defendant Di Bernardo.  An accompanying Order shall be entered.


**August 9, 2007**                             **s/ Jerome B. Simandle**
Date                                           JEROME B. SIMANDLE
                                               U.S. District Judge