IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMERSON ELECTRIC COMPANY, et al., | HON. JEROME B. SIMANDLE |
| Plaintiffs, | Civil Action No. 05-6042 (JBS) |
| v. | |
| LE CARBONE LORRAINE, S.A., et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Daniel A. Sasse, Esq.
CROWELL & MORING
3 Park Plaza
Irvine, CA 92614
                         -and-
Matthew J. McBurney, Esq.
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
     Counsel for Plaintiffs Valeo, S.A., Valeo, Inc., and
     Visteon, Inc.

Harris Neal Feldman, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS, LLP
220 Lake Drive East
Suite 200
Cherry Hill, NJ 08002-1165
                         -and-
Jonathan S. Feld, Esq.
Mary Ellen Hennessy, Esq.
KATTEN MUCHIN ROSENMANN, LLP
525 W. Monroe Street
Chicago, IL 60661-3693
     Counsel for Defendants Le Carbone Lorraine, Carbone Lorraine
     North America Corp., and Carbone of America Industries Corp.

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

Defendants Le Carbone Lorraine, S.A., Carbone Lorraine North America Corporation, and Carbone of America Industries Corporation (collectively, "Carbone" or "Defendants") seek partial summary judgment against Plaintiffs Valeo, S.A. and Valeo, Inc. (collectively, "Valeo" or "Plaintiffs Valeo"), and summary judgment against Visteon Corporation ("Visteon" or "Plaintiff Visteon").  Plaintiffs Valeo and Visteon are among those companies that opted out of a larger electrical carbon antitrust class action, which has settled.  See In re: Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389 (D.N.J. 2006).  Defendants, accused by Plaintiffs of engaging in a conspiracy to fix the price of electrical carbon products, argue that both Plaintiffs Valeo and Plaintiff Visteon lack standing to bring certain antitrust claims.  For the reasons set forth below, this Court will grant Defendants' motion for summary judgment as to Visteon [Docket Item 89], but deny Defendants' motion for partial summary judgment as to Valeo [Docket Item 88].

## II.  BACKGROUND

Plaintiffs bring this action pursuant to the Sherman Act, 15 U.S.C. § 1 and the Clayton Act, 15 U.S.C. §§ 15 and 26.  As set out in detail in Emerson Elec. Co. v. Le Carbone Lorraine, S.A., 500 F. Supp. 2d 437, 441-42 (D.N.J. 2007), Plaintiffs allege that

from October 1988 through September 2001 Defendants engaged in a conspiracy to artificially regulate the price of electrical carbon products, which Plaintiffs both directly and indirectly purchased at inflated prices.  (Am. Compl. ¶ 2.)

Valeo, in addition to its own purchase, bases its claim on purchases of electrical carbon products made by ITT Automotive Electrical Systems, Inc. ("ITT Automotive"), a subsidiary of ITT Industries, Inc., ("ITTI"). (Valeo Br. Opp'n at 1; Defs. Br. Valeo, Ex. A at 15.)  In June, 1998, Valeo entered into a Stock and Asset Purchase Agreement ("Purchase Agreement") with ITTI, in which it acquired certain assets owned by the conglomerate as well as 100% of ITT Automotive stock, along with the stock of several other ITTI subsidiaries.  (Defs. Br. Valeo, Ex. B.)

Visteon's claims arise from two Visteon-owned plants, the Rawsonville and Yspilanti plants in Michigan, both of which bought the allegedly fixed product.  (Valeo Br. Opp'n at 2.)  On September 30, 2005, Visteon completed the transfer of certain assets, including assets associated with the Rawsonville and Ypsilanti plants, to VFH Holdings, Inc.[1] ("VFH"), a wholly-owned subsidiary, through a Contribution Agreement ("the Agreement") dated September 12, 2005.  (Defs. Br. Valeo, Ex. A, Ex. B § 1.01.)  On October 1, 2005, Ford Motor Company ("Ford") purchased

---

[1] VFH was later renamed Automotive Components Holdings, Inc. (Defs. Br. Visteon, Exh. A.)

VFH from Visteon, thereby acquiring all of the transferred assets.  (Defs. Br. Valeo, Ex. A.)

On September 23, 2005, the original Complaint was filed in this action in the Eastern District of Michigan.  In December 2005, the Judicial Panel on Multidistrict Litigation transferred the case to this Court and in June 2006 Plaintiffs, including Valeo and Visteon, filed an Amended Complaint.  On August 9, 2007, this Court granted Defendants' motions to dismiss those antitrust claims based on injuries arising from foreign purchases and those under the Michigan Antitrust Reform Act, leaving only Plaintiffs' claims under the Sherman Act and the Clayton Act based on domestic injuries.  Emerson Electric, 500 F. Supp. 2d at 457.  After almost a year of discovery, on June 9, 2008, Defendants filed motions for partial summary judgment against the Valeo Plantiffs and summary judgment against Visteon Plaintiff.  On September 3, 2008, the Court heard oral argument from all parties and reserved decision.

## III. DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict

4

for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

### B. Antitrust Standing: Assignment of Antitrust Claims

Defendants argue that both Plaintiffs Valeo and Plaintiff Visteon do not have standing to assert certain antitrust claims. (Defs. Br. Valeo at 1; Defs. Br. Visteon at 1.) Defendants assert that Plaintiffs Valeo did not acquire from ITT Automotive the right to bring this antitrust claim and that Plaintiff Visteon assigned all its antitrust claims to Ford. (Defs. Br. Valeo at 1; Defs. Br. Visteon at 1.) A discussion, therefore, of the law of antitrust standing is warranted.

Plaintiff's standing, for the purposes of antitrust claims, requires more than that needed for Article III standing. As the Supreme Court has explained, "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination

5

whether the plaintiff is a proper party to bring a private antitrust action." <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 535 n.31 (1983). "Whether a plaintiff is the 'proper party' involves considerations of 'doctrines such as foreseeability and proximate cause, directness of injury, certainty of damages and privity of contract.'"[2] <u>Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.</u>, 995 F.2d 425, 429 (3d Cir. 1993)[3] (quoting <u>Associated Gen. Contractors</u>, 459 U.S. at 532-33).

It is well-established that an antitrust claim can be assigned. <u>Gulfstream</u>, 995 F.2d at 437. In <u>Gulfstream</u>, the Third Circuit determined that validity of such assignment is governed by federal common law and that the assignment itself must be "express." <u>Id.</u> at 437-40. The assignment at issue in <u>Gulfstream</u>

---

[2] The Supreme Court has established, and the Third Circuit has applied, a two-part test for determining whether the plaintiff is a proper antitrust party:

> To establish antitrust standing a plaintiff must show both: 1) harm of the type the antitrust laws were intended to prevent; and 2) an injury to the plaintiff which flows from that which makes defendant's act unlawful.

<u>Gulfstream</u>, 995 F.2d at 429 (citing <u>Int'l Raw Materials, Ltd. V. Stauffer Chem. Co.</u>, 978 F.2d 1318, 1327-28 (3d Cir. 1992)).

[3] <u>Gulfstream</u> was decided by a three-judge panel. Judge Seitz wrote the opinion of the court except as to the assignment of antitrust claims, on which he dissented. 995 F.2d at 428-437. Judge Greenberg wrote the opinion of the court on the assignment question. 995 F.2d at 437-440.

was a purchase agreement of the aircraft that plaintiffs alleged was the subject of price fixing, which included language of general assignment.  <u>Id.</u> at 437.  The agreement gave "all of [plaintiffs'] rights, title and interest in" the aircraft to the purchaser, without reference to antitrust claims.  <u>Id.</u>  Noting that "many routine transfers of ownership may involve a general assignment of rights," the court concluded that to find that such broad language was sufficient to assign antitrust claims would be contrary to the "direct purchaser" rule.  <u>Id.</u> at 439-40.  The "direct purchaser" rule limits antitrust plaintiffs to only those who directly purchase the products subjected to price fixing.  <u>Id.</u> at 439.  This rule, and thus ultimately the court's requirement of express assignment, was "founded on the difficulty of analyzing pricing decisions, the risk of multiple liability for defendants, and the weakening of private antitrust enforcement that might result from splitting damages for overcharges among direct and indirect purchasers."  <u>Id.</u>

    The Third Circuit expounded on its "express" assignment requirement in <u>Lerman v. Joyce Int'l, Inc.</u>, 10 F.3d 106 (3d Cir. 1993), a civil RICO case, after recognizing that the antitrust provisions of the Clayton Act served as a model for the similar provision of the RICO statute authorizing private civil actions. The <u>Lerman</u> court extended the reasoning in <u>Gulfstream</u> to another assignment - the purchase of assets of a company injured by

defendant's price fixing.  Id. at 108.  That assignment included
"without limitation, any and all of the following: . . . causes
of action, judgments, claims and demands of whatsoever nature."
Id.  The sweeping assignment was so clear that it did not present
any worry about determination of parties' intent.  Id. at 112.
The court held that this language was sufficiently "unambiguous
and all-inclusive" as to be "express" within the meaning of
Gulfstream.  Id.

       Finally, in 2006, Judge DuBois in the Eastern District of
Pennsylvania took the next logical step and applied the holding
in Lerman to a question of antitrust standing.  In re Linerboard
Antitrust Litig., 443 F. Supp. 2d 703 (E.D. Pa. 2006).
Linerboard, among other things, recognized that Lerman
illustrated the broad applicability of the Gulfstream standard.
Id. at 712.  Judge DuBois explained:

> [T]he decision confirmed that the rule announced in
> Gulfstream was not limited to assignments arising
> out of purchase agreements for an allegedly price
> fixed product.  While Gulfstream analyzed a
> purchase agreement for the product at issue in the
> antitrust litigation (an airplane), Lerman involved
> a purchase agreement for a division of a
> corporation.  The analysis in Lerman makes it clear
> that the rule in Gulfstream is applicable to . . .
> an agreement to purchase corporate assets.

Id. at 712.

       Consequently, in the Third Circuit, in order to establish
valid assignment of an antitrust claim a party must establish
that either (1) the assigning documents make express reference to

the assignment of antitrust claims or (2) the assignment of litigation claims is unambiguous and all-inclusive.  Lerman, 10 F.3d at 112.

### C.  Defendants' Motion for Partial Summary Judgment as to Plaintiffs Valeo

Defendants move for summary judgment against Plaintiffs Valeo with regard to their claims arising from ITT Automotive's purchase of electrical carbon products on the grounds that Valeo's purchase of 100 percent of ITT Automotive's stock did not include any antitrust cause of action.  (Defs. Br. Valeo at 1.) At the heart of this motion is a dispute about the nature of the transaction in which ITTI transferred ITT Automotive to Valeo. Defendants characterize the transfer as a stock purchase where certain unnamed assets were retained,[4] whereas Plaintiffs Valeo describes it as a pure stock purchase.  (Defs. Br. Reply at 5-8; Valeo Br. Opp'n at 5-8.)  As the Court explains below, it agrees with Valeo that nothing was withheld from its purchase of ITT Automotive and finds that all antitrust claims were validly assigned with this stock purchase.

---

[4] In their opening brief in support of their motion for partial summary judgment against Plaintiffs Valeo, Defendants appear to characterize the purchase of ITT Automotive solely as an asset purchase.  (Defs. Br. Valeo at 2-3.)  On reply, Defendants argue instead that, while a stock purchase, it was not a "clear-cut" stock purchase, because "certain ITT Automotive assets and liabilities were withheld from the stock purchase." (Defs. Br. Reply Valeo at 6.)

As recognized in the Third Circuit, "it is a general principle of corporate law that all assets and liabilities are transferred in the sale of a company effected by a sale of stock." In re KB Toys Inc., 340 B.R. 726, 728 (D. Del. 2006); see also Kool, Mann, Coffee & Co. V. Coffey, 300 F.3d 340, 365 (3d Cir. 2002) ("Indeed, by purchasing LCSDI's stock, and not just its assets, Kool Mann agreed to pay a particular price for LCSDI as a whole - its assets and its liabilities."); James C. Freund, Anatomy of a Merger § 4.6.2 (Law Journal Press 2008) (noting the risk of receiving unwanted liabilities in a stock purchase "since in a merger or stock acquisition [the purchaser] would automatically fall heir to all of [the target company's] assets, either directly or through a subsidiary").  Thus, absent explicit exclusionary language, in a stock purchase everything goes.  See Charles A. Scharf et al., Acquisitions, Mergers, Sales, Buyouts and Takeovers: A Handbook with Forms 41 (Prentice Hall 1991) ("If a buyer does not want particular assets or liabilities, it must arrange for the selling stockholders to strip them out of the corporation prior to sale.").

Consequently, the Court's first inquiry is whether ITTI retained any assets from Valeo's purchase of 100 percent of the equity interest in ITT Automotive.  (Defs. Br. Valeo, Ex. B at Ex. B.)  During oral argument, Defendants could point to only one provision of the Purchase Agreement which suggests some assets

were retained from the stock purchase of ITT Automotive.  The
contract provides that in calculating the Closing adjusted net
worth, certain unnamed "Excluded Electrical Company Assets" and
"Excluded Electrical Company Liabilities" would be retained by
the Sellers.  (Def. Br. Valeo, Ex. B § 3.3(a)(i)(B).)  Defendants
acknowledge that nowhere in the lengthy agreement are these
assets or liabilities listed.  Regardless, none of these
excluded, unnamed assets or liabilities relate to ITT Automotive.

"Electrical Companies" is a defined term, set forth in the
Recitals describing those entities transferred in the stock
purchase agreement, and does not include ITT Automotive:

> (A) all of the outstanding shares of capital stock
> of the Subsidiaries listed on <u>Exhibit A</u> (such
> shares, the "<u>Transferred Subsidiary Stock</u>") and all
> of the partnership interests in the partnership
> interests [sic] in the partnerships listed on
> <u>Exhibit A</u> (such partnership interests, the
> "<u>Partnership Interests</u>", and such Subsidiaries and
> partnerships, the "<u>Transferred Subsidiaries</u>" and,
> together with the direct and indirect Subsidiaries
> of the Transferred Subsidiaries listed on <u>Exhibit
> B</u>, collectively the "<u>Electrical Companies</u>") (such
> purchase, the "<u>Entity Purchase</u>") . . .

(Defs. Br. Valeo, Ex. B. at Recitals.)  The first parenthetical
contains three definitions - partnership interests in
partnerships listed in Exhibit A are "Partnership Interests,"
subsidiaries to be sold that are listed in Exhibit A are
"Transferred Subsidiaries," and the Transferred Subsidiaries'
direct and indirect subsidiaries that are listed in Exhibit B are
"Electrical Companies."  To read this otherwise, such as

including the Partnership Interests and the Transferred

Subsidiaries, as Defendants argue, in "Electrical Companies,"

would make the later all-inclusive descriptor - "Entity Purchase"

- duplicative.  Furthermore, later in the contract, two of these

defined terms are listed together, compelling the conclusion that

they have distinct meanings.  (Def. Br. Valeo, Ex. B § 4.17 (" .

. . the transfer of Electrical Company Stock, the Partnership

Interests, the Joint Venture Interests and the Purchased Assets .

. . will constitute a conveyance of all the assets, properties

and rights owned by ITTI and its controlled Affiliates and

necessary to conduct the Business in all material respects as

currently conducted.").

By the terms of the Purchase Agreement, ITT Automotive is

not an "Electrical Company."  ITT Automotive is listed in Exhibit

A as a "Company being Sold" for 100 percent of its equity

interest.  (Def. Br. Valeo, Ex. B at Ex. A.)  Therefore, it is a

"Transferred Subsidiary."  "Electrical Companies," on the other

hand, are the subsidiaries listed in Exhibit B - a list which

does not include ITT Automotive.[5]  Thus, even if Defendants could

---

[5] Exhibit B of the Purchase Agreement includes three columns, the first column listing the ITTI purchased subsidiaries, those Transferred Subsidiaries, the second column listing the relevant indirect subsidiaries of these Transferred Subsidiaries (acquired by the Transferred Subsidiaries through the Purchase Agreement as a means of conveyance) which are the Electrical Companies, and the third column describes the equity interest acquired in the Electrical Companies - in each case, 100 percent.  (Defs. Br. Valeo, Ex. B at Ex. B.)

point to specific "Excluded Electrical Company Assets" or
"Excluded Electrical Company Liabilities" listed in the Purchase
Agreement, these excluded assets and liabilities do not relate to
ITT Automotive.  ITT Automotive was transferred in its entirety,
and without anything held back, to Plaintiffs Valeo.

Defendants argue that even in a transfer of 100 percent
equity interest in an entity through a stock purchase, such as
this one, with nothing excluded, there must be either explicit
transfer of antitrust claims or the particular language used in
Lerman.  The Court will not adopt such a rule, as it runs counter
to the reasoning in both Lerman and Gulfstream.  The Lerman court
began its analysis of antitrust assignment with the "general
rule," that "'terms of art are not required for a valid
assignment.'" 10 F.3d at 112 (quoting United States ex rel. Kelly
v. Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993)).  The court,
therefore, concluded that Gulfstream standard did not require
explicit mention of antitrust claims, but rather could be
satisfied where the assignment was sufficiently "unambiguous and
all-inclusive" so there could be no doubt about the intent of the
parties to transfer antitrust claims.  Id. at 112.  No assignment
could be more unambiguous and all-inclusive than the purchase of
100 percent of the stock of a company.  There need not be a list
of assets conveyed, nor language of general or specific
assignment, because as the Third Circuit has recognized, in a

13

stock purchase the purchaser acquires the company "as a whole -
its assets and its liabilities." Kool, Mann, 300 F.3d at 365.
When Valeo acquired 100 percent of ITT Automotive stock, that
necessarily included any antitrust claims.

Given the unambiguous and all-inclusive nature of the stock
purchase, as outlined in the Purchase Agreement, Valeo acquired
ITT Automotive's antitrust claims through a valid assignment
under Lerman and Gulfstream, and consequently has standing to
bring those claims before this Court.  For these reasons, the
Court will deny Defendants' motion for partial summary judgment
as it relates to Valeo's antitrust claims arising from the
alleged injury to ITT Automotive.

### D.    Defendants' Motion for Summary Judgment as to Plaintiff Visteon

Defendants also ask this Court to grant summary judgment
against Plaintiff Visteon, arguing that Visteon assigned to Ford
all of its rights relating to its purchases of electrical carbon
products, including all antitrust claims.  (Defs. Br. Visteon at
7-8.)  Visteon does not dispute that Ford acquired all assets
owned by VFH, when it purchased the subsidiary in October 2005.
(Visteon Br. Opp'n at 1-4.)  Rather, Visteon argues that it did
not transfer its electrical carbon products antitrust claims to
VFH through the Contribution Agreement.  (Visteon Br. Opp'n at 6-
9.)  The Court concludes that Visteon did convey, through
unambiguous and all-inclusive language in the Agreement, all of

the antitrust claims raised in this action, and that Visteon

therefore lacks standing as a proper antitrust party.

The Contribution Agreement, being at the center of this

dispute, is also the focus of the Court's attention.  Article 2

of the Agreement describes the assets to be conveyed to VFH,

which would then be transferred to Ford:

> Except as otherwise provided below (including under
> Section 2.02) and subject to Section 2.05 and
> Section 5.07 . . . Visteon agrees to convey,
> transfer, assign and deliver . . . to VFH Holdings
> . . . all of Visteon's and its Affiliates' right,
> title and interest in, to and under the assets,
> properties and business, of every kind and
> description, wherever located, real, personal or
> mixed, tangible or intangible, known or unknown,
> owned, held or used in or otherwise associated with
> the Business ("the CONTRIBUTED ASSETS") . . . to
> and under the following, to the extent owned, held
> or used in or otherwise associated with the
> Business:
> [ . . .]
> (vii) all rights, claims, credits, causes of action
> or rights of set-off against third parties relating
> or arising from the Contributed Assets, including
> unliquidated rights under manufacturers' and
> vendors' warranties (provided that any such rights,
> claims, causes of action or rights of set-off
> against third parties shall, to the extent relating
> to Visteon Retained Liabilities or to the
> businesses and assets of Visteon and its Affiliates
> other than the Contributed Assets and the Business,
> be deemed to be "Excluded Assets").

(Defs. Br. Visteon, Ex. B §§ 2.01, 2.01(vii).)

The Agreement defines "Business" as "the operations . . .

conducted by Visteon and its affiliates at the Plants." (Defs.

Br. Visteon, Ex. B § 1.01).  "Plants," in turn, includes both the

Rawsonville and Ypsilanti plants - the two plants that purchased

the electrical carbon products in question. (Id.) Thus, the operations at the plants that purchased electrical carbon products are included in the "Contributed Assets" - as well as "all rights, claims, credits, causes of action" related to those plants.

The language in the Contribution Agreement mirrors the unambiguous and all-inclusive language examined in Lerman. See 10 F.3d at 112. Visteon transferred "all rights, claims, . . . causes of action . . . relating to or arising from" the Rawsonville and Ypsilanti plants to VFH, just as the plaintiff in Lerman acquired "'all of' [the injured company]'s 'causes of action, . . . claims and demands of whatsoever nature.'" See id. It is clear from this language that any antitrust claims related to the purchase of electrical carbon products were included in these "claims" and "causes of action" that were transferred to VFH, and later to Ford, and consequently the Contribution Agreement meets the Gulfstream "express" standard. See Lerman, 10 F.3d at 112; Gulfstream, 995 F.2d 441.

Plaintiff Visteon argues that the language in section 2.01 does not satisfy Lerman because it is not sufficiently unambiguous and all-inclusive. (Visteon Br. Opp'n at 6-9.) In support of this argument, Visteon points to the parenthetical language in section 2.01(vii), which explains that all claims and causes of action "relating to Visteon Retained Liabilities or to

16

the business and assets of Visteon and its Affiliates other than the Contributed Assets and the Business" were not included in the transfer.  (Defs. Br. Visteon, Ex. B § 2.01(vii).)  Neither Visteon Retained Liabilities nor the business and assets of Visteon "other than the Contributed Assets and the Business," however, bear any relationship to the antitrust claims tied to Rawsonville and Ypsilanti and therefore this language does not narrow the unambiguous and all-inclusive nature of the assignment.

As discussed, the operations at the plants that purchased electrical carbon products are included in the Contributed Assets, and so those claims related to Visteon business and assets not included in the Contributed Assets, cannot include the antitrust claims at issue.  (Defs. Br. Visteon, Ex. B, §§ 1.01, 2.01, 2.01(vii).)

Likewise, Visteon Retained Liabilities, and rights, claims, causes of action or rights of set-off against third parties related to such liabilities, cannot include the antitrust claims. Plaintiff Visteon struggled, both in its brief and in oral argument, to link antitrust claims to liabilities, and in neither case was it successful at resolving what is essentially a paradox.  An antitrust claim, as Visteon rightly conceded at oral argument, is an asset.  See C.I.R. v. Banks, 543 U.S. 426, 435 (2005) (noting that for tax purposes an "income-generating asset

17

is the cause of action that derives from plaintiff's legal injury").  A liability is just the opposite - it is a "legal responsibility" or a "financial or pecuniary obligation." Black's Law Dictionary 925 (7th ed. 1999).[6]  Furthermore, the only possible reading of "rights, claims, causes of action or rights of set-off against third parties . . . relating to Visteon Retained Liabilities" is a narrow one - it includes those claims against third parties, such as demands for contribution or indemnification, that are brought after the company is faced with a particular liability.  Such claims cannot include antitrust claims, which are assets used to recover from another's misconduct, whereas claims related to liabilities derive from the liable party's own alleged conduct.

Plaintiff Visteon offers a contorted argument for reconciling these two apparent opposites - the asset of an antitrust claim and the obligation of a liability.  Visteon points to the provisions detailing Assumed Liabilities, section 2.03, which arise after Closing, and Visteon Retained Liabilities, section 2.04, which arose before Closing, and suggests that these provisions, read in concert with the language in 2.01(vii), indicate that Visteon retains all claims arising

---

[6] The Agreement provides a broad definition of "liabilities," that includes "liabilities, obligations, or commitments of any kind whatsoever," and nothing in this definition suggests any meaning contrary to that of normal, English usage.  (Defs. Br. Visteon, Ex. B § 1.01.)

18

out of pre-Closing conduct and Ford assumed only those claims arising out of post-Closing conduct. (Visteon Br. Opp'n at 9-11.) To do so would morph the meaning of "liability" to include some amalgam of "conduct," "cause of action," and "legal responsibility."  The Court will not create this chimera. Rather, the Court will be led by the plain meaning of the Contribution Agreement.  The Agreement provides that Visteon retains certain liabilities, meaning "obligations" or "legal responsibility," some of which arise out of pre-Closing conduct or circumstances, but Visteon transferred all claims that could possibly include the antitrust claims at issue.  (Defs. Br. Visteon, Ex. B §§ 1.01, 2.01(vii), 2.04.)  Contrary to what Visteon argues, the carve-out provision does not make Lerman inapplicable, for "[t]he wording of the assignment in this case . . . could not reasonably lead to" any difficulty in determining whether the assignment "had been intended by the parties to transfer antitrust claim." 10 F.3d at 112.  The assignment of antitrust claims, unambiguous and all-inclusive, thereby meets the requirements of Gulfstream and Lerman.  See id.

     Faced with the clear meaning of the Agreement, Visteon asks the Court to look beyond its four corners.  Attached to its Brief in Opposition, Plaintiff Visteon included two declarations: a declaration from Marcia J. Nunn, General Counsel for Automotive Components Holdings (formerly VFH) and Managing Counsel for Ford

(Exh. 1); and a declaration from Michael K. Sharnas, Assistant General Counsel at Visteon Corporation (Exh. 2). Ms. Dunn declares that "neither Ford nor [Automotive Components Holding, formerly VFH] believes that the antitrust claims at issue . . . . were transferred to Ford or [Automotive Components Holding] from Visteon." (Visteon Br. Opp'n, Ex. 1.) Nor do they intend, according to Ms. Dunn, to assert any antitrust claims related to electrical carbon products in the future. (Id.). Mr. Sharnas declares that the parenthetical language in section 2.01(vii) "was added at Visteon's request to ensure that Visteon retained claims - including antitrust claims - relating to events that occurred prior to the closing of the transactions contemplated in the Contribution Agreement." (Visteon Br. Opp'n, Ex. 2.) Furthermore, Mr. Sharnas reports that since Closing Visteon has "retained liability" and "collected warranty performance credits" related to products sold prior to Closing. (Id.)

Visteon asks the Court to consider this extrinsic evidence on two separate grounds. First, Visteon argues that because the Agreement is ambiguous, this Court should consider extrinsic evidence of the parties' intent when they entered the contract. (Visteon Br. Opp'n at 12.) As the Court has explained, the Agreement is not ambiguous. The determination of whether a contract is ambiguous for the purposes of antitrust assignment is governed by federal common law, and not state law, as Visteon

urges. <u>Gulfstream</u>, 995 F.3d at 437-38.   Even under Michigan law, the governing law under the Agreement per section 10.05 , the contract cannot be "reasonably understood" differently.  <u>See Universal Underwriters Ins. Co. v. Kneeland</u>, 628 N.W.2d 491, 496 (Mich. 2001) (internal citations omitted).  Where the contract is unambiguous, the Court cannot consider extrinsic evidence of parties' intent.[7]  <u>See</u> <u>Blackhawk Dev. Corp. v. Vill. of Dexter</u>, 700 N.W.2d 364, 373 (Mich. 2005) ("[C]onsidering extrinsic evidence in the absence of ambiguous language is 'clearly inconsistent with the well-established principles of legal interpretation . . . and is thus incorrect.'") (citations omitted).  Furthermore, were the Agreement ambiguous, the Court would have found that there was no assignment of antitrust claims and denied summary judgment, making these declarations irrelevant.  <u>See</u> <u>Gulfstream</u>, 995 F.2d at 440.

Second, Visteon argues that the Agreement is not ambiguous and these declarations represent course of conduct, which provides further support for Visteon's theory that Visteon retains all claims arising from pre-Closing conduct.  (Visteon

---

[7] The Court also finds the Agreement's integration clause compelling.  (Defs. Br. Visteon, Ex. B § 10.10 ("This Agreement and the other agreements referred to in Section 8 of the Master Agreement constitute the entire agreement between the parties with respect to the subject matter of such agreements and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of such agreements."))

Br. Opp'n at 14.)  Visteon cites a single, unpublished Michigan
Court of Appeals decision for the proposition that this Court
should consider "course of performance" in interpreting an
unambiguous contract.  (Visteon Br. Opp'n at 14.)  In <u>Dilusso</u>
<u>Bldg. Co. v. Concord Indus. Group</u>, No. 233912, 2003 WL 462425, at
*2 (Mich Ct. App. Feb. 21, 2003), the court of appeals concluded
that course of performance could be used "<u>against</u> the party so
performing" as evidence that a contract had been "modified."  As
is evident, the declarations Visteon offers are not being used
against the parties so performing.  Further, the "performance" in
question is Ford's intent not to bring any antitrust claims and
Visteon's enforcement of the Retained Liabilities as expressly
provided for in the Agreement. (Defs. Br. Visteon, Ex. B §
2.04(iii) (Visteon retains all liabilities "relating to or
arising from any product manufactured or sold by the Business
prior to the Closing . . . including any warranty or recall
obligation or product liabilities.")) Nothing in the "course of
performance" evidence presented by Visteon suggests that Ford and
Visteon have modified their agreement such that Ford has, if it

could,[8] given back the antitrust claims which it received under the unambiguous terms of the Agreement.

Therefore, because Visteon successfully assigned its antitrust claims in this case to VFH, and later to Ford, it is left without standing to bring this action and the Court shall grant Defendants' motion for summary judgment as to Plaintiff Visteon.

**IV.    CONCLUSION**

For the reasons explained above, the Court will deny Defendants' motion for partial summary judgment as to Valeo's claims arising from ITT Automotive's alleged injury, but grant Defendants' motion for summary judgment as to Visteon.  The accompanying Order will be entered.

<u>October 7, 2008</u>                    <u> s/ Jerome B. Simandle</u>
Date                                  JEROME B. SIMANDLE
                                      United States District Judge

---

[8] The Court will not address whether an antitrust claim, once validly assigned, could in essence be returned by conduct and without an express written agreement.  It is worth noting, however, that <u>Gulfstream</u> strongly suggests it could not.  995 F.2d at 440 ("[A]ny assignment of antitrust claims, as a matter of federal common law, must be an express assignment.").